## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,

       Plaintiff,

v.

(43) Eric Stephen Esherick,

       Defendant.

Crim. No. 20-232 (JRT/BRT)

**ORDER AND
REPORT AND
RECOMMENDATION**

Harry Jacobs, Esq., Joseph H. Thompson, Esq., and Matthew S. Ebert, Esq., United States Attorney's Office, counsel for Plaintiff.

Charles L. Hawkins, Esq., Charles Hawkins Law Office, counsel for Defendant Esherick.

BECKY R. THORSON, United States Magistrate Judge.

On October 20, 2020, Defendant Eric Stephen Esherick was indicted on one count of conspiracy to commit mail fraud and two counts of wire fraud, along with forty-two other Defendants in an alleged nationwide conspiracy to commit mail and wire fraud in the telemarketing of magazine subscriptions. (Doc. No. 15, Indictment.) This matter is now before the Court on Defendant Esherick's Motion to Suppress Evidence Obtained Through Illegal Search (Doc. No. 934), and Motion to Suppress Confessions, Admissions or Statements Made in the Nature of Confessions Made by the Defendant (Doc. No. 935). Defendant seeks to suppress evidence obtained through the execution of a search warrant

for his residence (Gov't Ex. 5),[1] as well as the statements he made to law enforcement on the day of the executed search. (*See* Doc. Nos. 934, 935.) The Court held a hearing on the matter on March 3, 2022, and ordered supplemental post-hearing briefing. (Doc. No. 1167.) On April 14, 2022, Defendant Esherick filed his supplemental brief (Doc. No. 1186), and on May 5, 2020, the Government filed a response opposing the motion. (Doc. No. 1196.)

This matter has been referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and D. Minn. LR 72.1. For the reasons stated below, this Court recommends that Defendant Esherick's motions be denied.

## DISCUSSION

### I.    Motion to Suppress Evidence Obtained Through Search Warrant

#### a.    Probable Cause Standard

The Fourth Amendment requires probable cause to be shown before a search warrant is authorized. U.S. Const. amend. IV; *United States v. Williams*, 477 F.3d 554, 557 (8th Cir. 2007). In determining whether probable cause exists, a detached and neutral judge must make "a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *see also Walden v. Carmack*, 156 F.3d 861, 870 (8th Cir. 1998) ("The standard of probable cause for the issuing judge is whether, given the totality

---

[1]    This Court refers to the Exhibit numbers as reflected on the March 3, 2022 Hearing Exhibit List. (*See* Doc. No. 1168.)

of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place.") (quotations omitted). "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Gates*, 462 U.S. at 232. Courts should not review search warrants in a hyper-technical fashion. *United States v. Caswell*, 436 F.3d 894, 897 (8th Cir. 2006).

"When . . . the issuing court relies solely on an affidavit to determine whether probable cause exi[sts], only the information found within the four corners of the affidavit may be considered." *United States v. Wells*, 347 F.3d 280, 286 (8th Cir. 2003) (quotations omitted). In reviewing the decision of the issuing court, this Court must ensure that the court "'had a substantial basis for . . . conclud[ing] that probable cause exists.'" *United States v. Oropesa*, 316 F.3d 762, 766 (8th Cir. 2003) (quoting *Gates*, 462 U.S. at 238–39). Because reasonable minds may differ on whether a particular search-warrant affidavit establishes probable cause, the issuing court's determination is accorded great deference. *United States v. Wajda*, 810 F.2d 754, 760 (8th Cir. 1987) (citing *United States v. Leon*, 468 U.S. 897, 914 (1984)).

**b.    Nexus**

In 2019 and throughout 2020, law enforcement officers investigated Defendant Esherick, along with other individuals, as part of an investigation into a nationwide conspiracy to commit mail and wire fraud in the telemarketing of magazine subscriptions.

3

On August 4, 2020,[2] a search warrant issued to search Defendant's residence in Andover, Minnesota, for "[a]ny and all records related to Quality Readers Services LLC and any related or predecessor companies, and their owners and operators (including Eric Esherick), and their involvement in fraudulent magazine sales," among other things. (Gov't Ex. 5, Attachs. A, B.) Defendant argues that the application supporting the warrant to search his residence did not establish a nexus between the place to be searched and any criminal activity attributable to him. In particular, he asserts that there is no evidence that he was running Quality Readers Service (a company under investigation as allegedly involved in the magazine fraud scheme) out of his new Andover residence.

A search warrant application must establish a nexus between evidence of a crime and the place to be searched, such that there is a "fair probability" to believe evidence will be found in the place. *United States v. Tellez*, 217 F.3d 547, 550 (8th Cir. 2000). The "requisite nexus" between the place to be searched and the evidence sought depends on the nature of the crime, reason, and logic. *United States v. Etheridge*, 165 F.3d 655, 657 (8th Cir. 1999).

---

[2]     The date noted on the application indicating when the application was subscribed and sworn to before the judge, which was signed by the United States Magistrate Judge, was August 4, 2020. The date noted by that same Magistrate Judge on the face of the warrant indicating when the warrant issued was August 3, 2020. It is apparent that one of the two of these dates was a typographical error. Even with this error, the good-faith exception to the exclusionary rule would still apply, as further explained below.

The affidavit submitted in support of the search warrant for Defendant's residence explains[3] that in February 2020, Individual M's company was searched in connection with the investigation of the nationwide magazine sales fraud scheme. (Gov't Ex. 5 at ¶¶ 55–56.) After the search, Individual M participated in a proffer interview at the U.S. Attorney's Office; at that interview, Individual M explained that he had been involved in magazine sales since the 1990s, admitted that he had worked for a series of companies involved in fraudulent magazine sales, and admitted that he and his company were involved in fraudulent magazine sales. (*Id.* ¶ 56.) At a later interview, Individual M stated that Defendant Esherick had worked at Individual M's company for approximately ten years from 2006 to 2016, and he identified Defendant Esherick as an individual involved in fraudulent magazine sales. (*Id.* ¶¶ 58–59.) Individual M also stated that Defendant Esherick now runs his own magazine company called Quality Readers Services from his home. (Gov't Ex. 5 at ¶ 60.)

As explained in the search warrant affidavit, according to the Minnesota Secretary of State records, Quality Readers Service was formed on or about November 2016, Defendant Esherick was its manager, and it was located at a certain address in Ramsey, Minnesota, which was Defendant Esherick's address up until March 2020. (Gov't Ex. 5 at ¶¶ 7–9.) In March 2020, postal service records show that Esherick moved to the subject

---

[3]     The affiant for the affidavit submitted in support of the apartment search warrant was U.S. Postal Inspector John Western, who had been employed with the United States Postal Inspection Service for approximately thirteen years at the time and was assigned to the Mail Fraud Team at the Denver Division, Twin Cities Field Office in Minneapolis, Minnesota. (Gov't Ex. 5 at ¶ 1.)

premises in Andover, MN, which is the target address for the search warrant at issue. (Gov't Ex. 5 at ¶ 9.) Investigators learned that after Defendant Esherick had moved to his new address, his wife sent an email to co-Defendant John Harbert and Defendant Esherick with a PDF document containing "the type of information that companies use to carry out the fraudulent magazine sales scheme" attached to the email.[4] (Gov't Ex. 5 at ¶ 70.) The affidavit further explains:

> During the investigation, Individual A[5] identified John Harbert as another lead broker who sells customer leads to magazine companies. Individual A explained that Harbert has had a close relationship with several Minnesota companies involved in fraudulent magazine sales. According to Individual M, Esherick purchased leads from Harbert.

---

[4]    In addition, an agent conducted surveillance at Defendant's residence on August 1, 2020, and observed Defendant Esherick's car parked at his residence. (Gov't Ex. 5 at ¶ 10.)

[5]    Individual A and his company Your Magazine Service, Inc. were sued by the Minnesota Attorney General's Office in June 2016 for allegedly operating a fraudulent telemarketing company that preyed on elderly and other vulnerable consumers. (Gov't Ex. 5 at ¶ 16.) In November 2017, summary judgment was granted in favor of the Minnesota Attorney General's office. (*Id.*) In December 2018, Individual A was indicted on four counts of mail fraud and four counts of wire fraud. (*Id.* ¶ 17.) After the indictment, Individual A agreed to give proffer interviews at the U.S. Attorney's Office; at those interviews, Individual A admitted that he ran his company in a fraudulent manner, and explained that his company was part of a nationwide network of fraudulent magazine companies that worked together to defraud victims. (*Id.* ¶ 18.) Individual A also stated that the buying and selling of customer lists or "lead lists" was a key component of this scheme." (*Id.* ¶ 20.) A lead list is "a list of potential customers for salespeople to call, often relying on a pre-written sales script." (*Id.*) Individual A stated that "he traded lead lists with other fraudulent magazine companies" and "he also purchased lead lists from 'lead brokers,' who are in the business of buying and selling lead lists. (*Id.* ¶ 23.) Individual A identified several lead brokers with whom he traded lead lists, including John Harbert. (*Id.*)

(Gov't Ex. 5 at ¶ 63.) In addition, the affiant officer stated that "[b]ased on actual inspection of other evidence related to this investigation, including emails obtained through search warrants, I am aware that computer equipment was used to carry out this fraud scheme," and he stated that "[t]here is reason to believe that there is a computer system currently located on the Subject Premises." (Gov't Ex. 5 at ¶ 73.e.) Further, the affiant officer stated that based on his experience and training, he knows that –

> a.     Businesses generally maintain or keep journals, ledgers, bank statements and records, receipts, invoices and other documents evidencing the receipts and disbursements of funds, inventories, assets of the business and personnel information. These records are usually kept and maintained for extended periods of time, often several years, at **the place of business or residence**. I know from previous investigations that such records are also often maintained **at the residence** of subjects.

> b.     Individuals, including those receiving income from fraud schemes, often maintain **within their residence** records of assets and financial transactions . . . . These records are often maintained for extended periods of time, often several years.

(Gov't Ex. 5 at ¶ 4 (emphasis added).)

As shown in the information cited above, the affidavit sufficiently describes Defendant Esherick's connection with Quality Readers Service, activity that linked Quality Readers Service and Defendant Esherick with the fraudulent magazine scheme (including the evidence that he purchased lead lists from John Harbert), information that showed Defendant Esherick worked on the company's business dealings out of his home, and information that indicated business dealings were occurring even after Defendant Esherick moved to his new home in Andover. What is required for the search warrant to be constitutionally valid is a "fair probability" to believe—based on the search warrant

7

affidavits—evidence will be found in the residence. *Tellez*, 217 F.3d at 550. This Court concludes that the totality of the information in the affidavit provided support for a fair probability that evidence of the magazine fraud scheme would be found in Defendant Esherick's home. *See United States v. Bradley*, 644 F.3d 1213 (11th Cir. 2011) (finding probable cause existed to issue search warrant for residence of defendant, a participant in a fraud scheme, when defendant had a personal office at his home with a desk and computer, and he received mail of a financial nature there); *see also United States v. Keele*, 589 F.3d 940, 943–44 (8th Cir. 2009) (holding that an agent's affidavit explaining their experience with how people utilize their residences for illicit behavior was sufficient for a nexus after knowing that the defendant was engaged in some illegal activity); *United States v. Walker*, No. 11-381 (SRN/JJG), 2014 WL 36635, at *6 (D. Minn. Jan. 3, 2014) ("[I]ndividuals often retain documentation of assets and finances at their homes.").

Because this Court concludes that the warrant application for the residence provides the required nexus and the totality of the information supports finding the warrant is supported by probable cause, Defendant Esherick's motion to suppress as it relates to the search warrant for his Andover residence should be denied.

### c.    *United States v. Leon*

Even if probable cause did not exist, this was a facially valid warrant, and therefore the good-faith exception to the exclusionary rule, established in *United States v. Leon*, 468 U.S. 897 (1984), would have to be considered. "Under the good-faith exception, evidence seized pursuant to a search warrant that lacked probable cause is admissible if the executing officer's good-faith reliance on the warrant is objectively

reasonable." *United States v. Perry*, 531 F.3d 662, 665 (8th Cir. 2008). "The good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the [issuing judge's] authorization." *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007) (alteration in original) (quotations omitted). "When assessing the objective [reasonableness] of police officers executing a warrant, [the Court] must look to the totality of the circumstances, including any information known to the officers but not presented to the issuing judge." *Id.* at 431 (alteration in original) (quotations omitted). Here, this Court concludes that the good-faith exception would apply to the search warrant for Defendant's residence. There is no evidence to suggest that the officers' reliance on the warrant was not in good faith, nor is there evidence that the officers' reliance was not reasonable. For these reasons, this Court concludes that the evidence seized as a result of the execution of the search warrant should not be suppressed and Defendant's motion should be denied.

## II.    Motion to Suppress Statement

On March 3, 2022, the Court held an evidentiary hearing where FBI Special Agent Dustin Berger testified regarding Mr. Esherick's statement to law enforcement and Assistant United States Attorney Harry Jacobs on August 5, 2020. (*See generally* Doc. No. 1192, 3/3/22 Hearing Transcript ("Tr.").)[6] The following summary is based on Special Agent Berger's testimony provided at the hearing.

---

[6]    Special Agent Berger has worked for the FBI for approximately fourteen and a half years, and is currently working out of the Brooklyn Center, Minnesota office on a variety of cases, including white collar/fraud cases. (Tr. 14.)

## A. Background

On August 5, 2020, at approximately 8:00 a.m., law enforcement executed a
search warrant at Defendant Esherick's residence in Andover, Minnesota. (Tr. 18–19.)
Two special agents from the FBI approached and knocked on the door, which was
answered by one or both Defendant Esherick and his wife; their son was also home at the
time. (Tr. 20, 23.) The special agents identified that they had a search and seizure warrant
for the residence and that they were going to be conducting the search at that time. (*Id.*)
Once it was agreed that the search would proceed, the two special agents called up other
agents to clear the residence and start the search. (*Id.*) In total, six special agents from the
FBI, two postal inspectors, and six support employees were involved in the execution of
the warrant. (Tr. 19.) The agents arrived at the residence dressed in casual attire but also
wore body armor with identification and carried firearms; however, the agents never took
out their firearms. (Tr. 22.)

After the house was cleared and agents began to execute the search, Special Agent
Berger, Special Agent Travis Yarbrough, and AUSA Harry Jacobs spoke with Defendant
Esherick separate from his wife and son. (Tr. 24.) The interview occurred at a picnic table
in Defendant Esherick's backyard. (Tr. 25.) The weather was nice that day. (Tr. 25.) The
goal of the interview was to ask questions and gain Defendant Esherick's cooperation
with the investigation into the nationwide scheme. (Tr. 24.)

The agents advised Defendant Esherick that his residence was being searched
pursuant to an authorized search and seizure warrant, that he was not under arrest, and
that he could stay at the house but could not impede the search. (Tr. 25–26.) Defendant

10

Esherick was further advised that the interview was completely voluntary, and he was free to leave at any time.[7] (Tr. 26.) The agents then provided Defendant Esherick with a summary of why they were there and the magnitude of the investigation. (Tr. 27.) This included information about the dozens of searched call centers located through the United States in February 2020, and they showed him an example of a victim statement. (Tr. 28–29.) Although the agents were asking for his cooperation, they did not make any promises to him. (Tr. 29–30.) After hearing about the investigation, Defendant Esherick agreed to speak with the agents. (Tr. 31.)

Special Agent Berger described Defendant Esherick's demeanor as nervous at first, but then he became less nervous, and was very open with a cooperative posture throughout the interview. (Tr. 30, 32.) At no time during the interview did the agents yell or raise their voices. (Tr. 34.) At some point during the interview, Defendant Esherick asked whether he should have a lawyer. (Tr. 50–51, 67.) The agents told him that it was his personal decision if he wanted to contact a lawyer, but that they could not advise him of that. (Tr. 51, 68, 69.) Defendant Esherick did not stop the interview at that time, but instead continued with the interview. (*See generally* Tr. 51–72.) Special Agent Berger stated the interview lasted approximately one to two hours.[8] (Tr. 32.)

---

[7]     Special Agent Berger explained at the hearing that they did not give Defendant Esherick a *Miranda* warning because, in his words, they "were not doing a custodial interview." (Tr. 26.)

[8]     At some point during the interview, Defendant Esherick requested, and he was allowed, to go inside to get a refreshment and to use the bathroom. (Tr. 48.) Special Agent Berger testified that he was accompanied inside the house for safety reasons. (*Id.*)

At the end of the interview, Defendant Esherick had several questions about next steps. (Tr. 34.) AUSA Jacobs informed him that it was a good thing that he was cooperating with them, and that he may get cooperation credit, but they could not make any promises about that. (Tr. 34.) Defendant Esherick then asked whether he was going to be charged, and he was told that he probably would get charged, but that the decision had not yet been made. (Tr. 34.) The agents did not arrest Defendant Esherick at that time.

Defendant Esherick was later charged on October 20, 2020, and he self-surrendered on October 28, 2020. (Doc. No. 1196 at 19.)

### B. Analysis

Defendant first argues that Esherick's statements made on August 5, 2020, are "fruit of the poisonous tree," meaning that the statements were obtained only due to the illegal search of his residence. As stated above, the search warrant for the residence was supported by probable cause. Therefore, Defendant's fruit-of-the-poisonous tree argument fails.

Defendant also challenges the admissibility of the statements he made to the agents on August 5, 2020, on grounds that he was provided no *Miranda* warnings when they were required. The Government opposes Defendant's motion to suppress and argues that the August 2020 interview was both non-custodial and voluntary, and therefore *Miranda* warnings were not required.

To use a defendant's statements made during a custodial interrogation against him at trial, government agents must provide a *Miranda* warning prior to questioning. The

warning must inform a defendant that he has the right to remain silent, that anything he does say can be used against him as evidence, that he has a right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). These warnings need not follow a precise formulation, and the "inquiry is simply whether the warnings reasonably convey to a suspect his rights as required by *Miranda*." *Duckworth v. Eagan*, 492 U.S. 195, 203 (1989) (quotations and alterations removed).

A custodial interrogation that triggers the need for *Miranda* warnings is one that involves "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444. When analyzing whether a particular defendant was in custody at the time of an interrogation, "the ultimate inquiry is simply whether there [was] . . . restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quotations omitted); *see also United States v. Huether*, 673 F.3d 789, 794 (8th Cir. 2012) ("To determine whether a defendant was in custody for *Miranda* purposes, a court looks to the totality of the circumstances confronting the defendant at the time of the interview, and asks whether a reasonable person in his position would consider his freedom of movement restricted to the degree associated with formal arrest.") (quotations omitted). Although not an exhaustive list, in determining whether a defendant was in custody at the time of questioning, the Court considers such factors as:

(1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

*United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990); *see also United States v. Czichray*, 378 F.3d 822, 827–28 (8th Cir. 2004) (indicating that the *Griffin* factors serve as a guide in resolving the question "whether the defendant was restrained as though he were under formal arrest"). However, "'custody' cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision accordingly . . . . the ultimate inquiry must always be whether the defendant was restrained as though he were under formal arrest." *Czichray*, 378 F.3d at 827–28. In making this determination, courts must consider the "totality of the circumstances," *United States v. Sanchez*, 676 F.3d 627, 630 (8th Cir. 2012), and ask whether, in light of all the circumstances, "a reasonable person in [the suspect's] position would have felt free to end the interview." *United States v. Aldridge*, 664 F.3d 705, 711 (8th Cir. 2011).

To trigger the protections of *Miranda*, an individual must also be subjected to "interrogation." Interrogation refers to "questioning initiated by law enforcement officers." *Miranda*, 384 U.S. at 444. And it is defined as "express questioning or its functional equivalent," which includes "words or action on the part of the police (other than those normally attendant to arrest and custody) that the police should know are

reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980). Here, it is undisputed that Defendant Esherick was interrogated. The only question now before the Court is whether Defendant was in custody at the time of the interrogation.

Defendant Esherick argues that certain factors support finding that the interview was custodial. Defendant points to the fact that he was requested to accompany two federal law enforcement agents and an Assistant United States Attorney to a picnic table outside his house, he was told it was an opportunity to cooperate to help himself, he was advised of the lengthy investigation and the overwhelming evidence implicating him in the fraud, he was showed victim statements, and he was separated from his wife and son. (Doc. No. 1186 at 10–11.)

This Court disagrees with Defendant and concludes that he was not in custody when he was questioned on August 5, 2020; therefore, his statements to the agents that day need not be suppressed. The first *Griffin* factor weighs in favor of finding Defendant not in custody because the evidence shows that the agents told Defendant that he was not under arrest, that the interview was to be completely voluntary, and that he was free to leave at any time. This is "powerful evidence that a reasonable person would have understood that he was free to terminate the interview." *Czichray*, 378 F.3d at 826; *see also id.* ("[T]he most obvious and effective means of demonstrating that a suspect has not been taken into custody . . . is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will." (quoting *Griffin*, 922 F.2d at 1349)).

15

The second, third, and fourth *Griffin* factors (*i.e.*, that Defendant had unrestrained freedom of movement during questioning, Defendant voluntarily agreed to respond to questions, and no strong-arm tactics or deceptive stratagems were employed during questioning) also weigh in favor of finding Defendant not in custody. It is undisputed that Defendant voluntarily acquiesced to meeting with the agents at the picnic table outside his home and speaking with them. *See, e.g.*, *United States v. Rorex*, 737 F.2d 753, 756 (8th Cir. 1984) (finding interview non-custodial when the interview occurred "on his own turf"); *United States v. Warsame*, 488 F. Supp. 2d 846, 858 (D. Minn. 2007) (finding that defendant voluntarily submitted to questioning after being advised that the interviews were voluntary and that he was not under arrest). There is no evidence that Defendant was pressured into meeting with the agents at that location or pressured into answering questionings. The agents did not restrain him or brandish weapons at him at any point, and there were only two agents and an AUSA present during the questioning who were wearing casual clothes with their identification vests on and holstered weapons.[9] Defendant was questioned in the comfort of his own yard, at a picnic table near his home in nice weather. The questioning lasted approximately one to two hours, and at no time did the agents threaten Defendant or raise their voice during the interview.[10] When

---

[9]      There is no evidence that Defendant was aware that the agents were armed at the time of the interview.

[10]      The length of time the interview lasted is not determinative of whether it was custodial or non-custodial. *See Czichray.*, 378 F.3d at 825, 830 (concluding, after weighing several factors including the number of times that defendant was told his participation was voluntary and he was free to leave, that defendant was not the subject of custodial interrogation after an interview that lasted almost seven hours).

Defendant asked whether he should talk to a lawyer, the agents told him that was his personal decision, but that they could not advise him on that. Defendant Esherick did not ask to stop the interview, but instead continued with the interview, and there is no evidence that the agents pressured him at that time to continue with the interview. Defendant also had freedom of movement during the interview, which is evidenced by the fact that he did get up at one point and go inside to get a refreshment and to go to the bathroom. Although an agent did accompany him inside, Special Agent Berger testified that this was for safety reasons. *See United States v. Hammerschmidt*, No. 15-86(1) (DSD/JSM), 2015 WL 5313513, at *2 (D. Minn. Sept. 9, 2015) (concluding defendant was not deprived of his freedom of movement due to the agents' standing in an area blocking access to the dining room when there was no evidence defendant asked to leave the dining room or that the placement was "tantamount to a non-verbal threat or physical intimidation"). Therefore, the evidence reflects that Defendant voluntarily agreed to answer the agents' questions, Defendant had unrestrained freedom of movement during the questioning, and the agents did not use strong-arm tactics or deceptive stratagems during the interview. *See Czichray*, 378 F.3d at 829 ("This is not a case where a suspect sought to exercise his option of terminating the interview, only to meet resistance from his interrogators.").

Although the fifth *Griffin* factor (*i.e.*, whether the atmosphere of the questioning was police dominated) is a closer call because there were two agents and an AUSA present for the interview with holstered weapons, this Court concludes the factor does not tip the scale to turn this interview into a custodial interview. Here, Defendant agreed to

17

be interviewed, the interview took place in the comfort of Defendant's yard, and the agents' questioning was calm and conversational. *See United States v. Bordeaux*, 400 F.3d 548, 560–61 (8th Cir. 2005) (finding that an interview conducted by two officers in a police vehicle was not coercive).

Finally, the sixth *Griffin* factor undeniably weighs in the Government's favor, because Defendant was not placed under arrest at the termination of the questioning. The fact that the agents informed Defendant at the end of the interview that he may be charged, although that decision had not been made yet, does not alter the analysis. Defendant had voluntarily agreed to be interviewed, and voluntarily answered the questions asked. Informing Defendant that he may be charged after Defendant inquired about it was not coercive. Therefore, looking at the facts as a whole, the totality of the circumstances support the conclusion that Defendant was free to end the interview at any moment and that a reasonable person in his position would not have felt coerced to speak with the agents. There is no basis for this Court to conclude that simply because Defendant was questioned apart from his wife, or the fact that the agents informed Defendant of the nature of the investigation before starting the interview, transformed the atmosphere of the interview from a calm discussion into a custodial interrogation. *See Czichray*, 378 F.3d at 829 ("It is appropriate for an investigator to advise a suspect of the potential course and consequences of a criminal investigation.").

Although true that "the fact that the individual has become the focus of the investigation is relevant to the extent that the suspect is aware of the evidence against him and this awareness contributes to the suspect's sense of custody," *Griffin*, 922 F.2d at

18

1348 (quotations omitted), and although it may have been alarming for Defendant to see government agents at his doorstep that morning, there is no indication that Defendant was subjected to any coercive police action when the agents asked whether Defendant would have a conversation with them or during the conversation itself. Considering the *Griffin* factors and the totality of the circumstances in this case, this Court finds that Defendant was not in custody at the time of the interview, and therefore, admitting Defendant's August 5, 2020 statements to agents at trial will not violate his Fifth Amendment rights. Accordingly, Defendant Esherick's motion to suppress should be denied.

## III.    Defendant's Request for Disclosure of Agent's Notes

At the March 3, 2022 hearing, and during the questioning of Special Agent Berger, defense counsel moved for the disclosure of Special Agent Berger's notes that were taken at the time of the August 5, 2020 interview of Defendant Esherick. In Defendant's post-hearing brief, Defendant focuses on the fact that the topic of a lawyer came up during the questioning, and therefore asserts it is "highly probable that the rough notes and like materials contain information which is favorable to the defense." (Doc. No. 1186 at 13.) The Court disagrees; simply because a question was asked about a lawyer during the Interrogation does not mean that it is "highly probable" that Special Agent Berger's notes would contain *Brady*[11] material. However, because the topic of a lawyer was discussed, the Court finds it prudent for the Government to check the notes again to determine

---

[11]     *Brady v. Maryland*, 373 U.S. 83 (1963).

whether they contain *Brady* material or not.[12]

Therefore, the Court orders the Government to review Agent Berger's notes taken contemporaneously with the August 5, 2020 interview of Defendant Esherick for the purpose of determining whether any part of them would fall under *Brady*. If any notes could be interpreted as *Brady* material, they must be immediately produced.

## ORDER

Based on the file, record, and proceedings herein, and for the reasons stated above,

**IT IS HEREBY ORDERED** that:

1.     Defendant Esherick's request for the disclosure of Agent Berger's handwritten notes is **DENIED**. However, the Government is hereby ordered to review Agent Berger's notes taken contemporaneously with the August 5, 2020 interview of Defendant Esherick for the purpose of determining whether any part of them must be disclosed pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963). If any notes could be interpreted as *Brady* material, they must be immediately produced.

## RECOMMENDATION

Based on the file, record, and proceedings herein, and for the reasons stated above,

**IT IS HEREBY RECOMMENDED** that:

1.     Defendant Esherick's Motion to Suppress Evidence Obtained Through Illegal Search (Doc. No. 934) be **DENIED**; and

---

[12]     The Court notes that it makes no determination as to whether any information about a lawyer would have been required to be disclosed in the agent's 302 report.

2.      Defendant Esherick's Motion to Suppress Confessions, Admissions or

Statements Made in the Nature of Confessions Made by the Defendant (Doc. No. 935) be

**DENIED**.


Date: May 31, 2022                                          *s/ Becky R. Thorson*
                                                            BECKY R. THORSON
                                                            United States Magistrate Judge


### NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the
District Court and is therefore not appealable directly to the Eighth Circuit Court of
Appeals. Under Local Rule 72.2(b), any party may file and serve specific written
objections to this Report and Recommendation by **June 14, 2022**. A party may respond
to those objections by **June 28, 2022**. All objections and responses must comply with the
word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under
advisement 7 days from the date of its filing. If timely objections are filed, this Report
will be considered under advisement from the earlier of: (1) 7 days after the objections
are filed; or (2) from the date a timely response is filed.